IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBOTICVISIONTECH, INC., | ) | |
| | ) | |
| Plaintiff and Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1257-GBW |
| | ) | |
| ABB INC., | ) | |
| | ) | |
| Defendant and Counterclaim-Plaintiff. | ) | |
| | ) | |

**RVT'S OPPOSITION TO ABB INC.'S MOTION TO DISMISS COUNT II OF THE
COMPLAINT PURSUANT TO FED. R. CIV. P. 12(c) AND 35 U.S.C. § 101**

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com

*Attorneys for RoboticVISIONTech, Inc.*

OF COUNSEL:
J.C. Rozendaal
Michael E. Joffre
Daniel S. Block
William H. Milliken
Kristina Caggiano Kelly
Anna G. Phillips
Steven M. Pappas
Brooke N. McLain
Paige E. Cloud
Ryan N. Kaiser
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1101 K Street NW, 10th Floor
Washington, DC 20005
(202) 371-2600

Dated: August 12, 2024

# TABLE OF CONTENTS

I.      Nature and Stage of the Proceedings .................................................... 1

II.     Summary of Argument ......................................................................... 1

III.    Statement of Facts .............................................................................. 2

      A.     Prior-art machine-vision techniques and their drawbacks ...................... 2

      B.     The patented invention ......................................................................... 3

      C.     The claims .......................................................................................... 6

IV.    Legal Standard .................................................................................. 7

V.     Argument ........................................................................................... 9

      A.     The '814 patent claims are not directed to an abstract idea. .................. 9

            1.     The claims are directed to a novel, specific, and concrete series of steps that enable machine-vision systems using one or more image sensors to accurately determine the position and location of fixed features on three-dimensional objects without the need for stereo camera pairs or structured light .................................................. 9

            2.     ABB's step one arguments grossly overgeneralize the claims. ............... 14

      B.     The '814 patent claims contain inventive concepts. ............................. 18

VI.    Conclusion ....................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
573 U.S. 208 (2014).................................................................................................7, 8, 18

*Align Tech., Inc. v. 3Shape A/S,*
339 F. Supp. 3d 435 (D. Del. 2018)...............................................................................14, 20

*Align Tech., Inc. v. 3Shape A/S,*
C.A. No. 17-1647, 2020 WL 5979353 (D. Del. Oct. 8, 2020) ................................................19

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
841 F.3d 1288 (Fed. Cir. 2016)........................................................................................20

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC,*
827 F.3d 1341 (Fed. Cir. 2016).........................................................................................8

*Beacon Navigation GmbH v. Bayerische Motoren Werke AG,*
No. 2:13-cv-11410, 2023 WL 8951535 (E.D. Mich. Sept. 28, 2023) ....................................13

*Berkheimer v. HP Inc.,*
881 F.3d 1360 (Fed. Cir. 2018)........................................................................................8, 9

*Blackbird Tech. LLC v. Niantic, Inc.,*
C.A. No. 17-1810, 2018 WL 5630452 (D. Del. Oct. 31, 2018) ............................................14

*CardioNet, LLC v. InfoBionic, Inc.,*
955 F.3d 1358 (Fed. Cir. 2020)...............................................................................8, 15, 16, 17

*Carrum Techs., LLC v. BMW of N.A., LLC,*
C.A. No. 18-1645, 2019 WL 1779863 (D. Del. Apr. 23, 2019)............................................16

*Certain Mach. Vision Software, Machine Vision Sys., and Prods. Containing*
*Same Initial Determination,*
No. 337-TA-680, 2010 WL 4778782 (U.S.I.T.C. July 16, 2010)..........................................20

*ChargePoint, Inc. v. SemaConnect, Inc.,*
920 F.3d 759 (Fed. Cir. 2019)...........................................................................................9

*Cirba Inc. v. VMware, Inc.,*
C.A. No. 19-742, 2023 WL 2989049 (D. Del. Apr. 18, 2023)....................................7, 8, 9, 15

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC,*
15 F.4th 1091 (Fed. Cir. 2021) .........................................................................................19

*CyWee Group Ltd. v. Samsung Electronics Co.*,
    No. 2:17-CV-140, 2018 WL 5831241 (E.D. Tex. Nov. 7, 2018) ...........................................13

*Data Engine Techs. LLC v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018)...................................................................................................7

*Diamond v. Diehr*,
    450 U.S. 175 (1981)....................................................................................... *passim*

*Dominion Energy, Inc. v. Alstom Grid LLC*,
    725 F. App'x 980 (Fed. Cir. 2018) .........................................................................................19

*EagleView Techs., Inc. v. Xactware Sols., Inc.*,
    485 F. Supp. 3d 505 (D.N.J. 2020) ..................................................................................10, 14

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016).................................................................................................1

*Google LLC v. EcoFactor, Inc.*,
    602 F. Supp. 3d 1265 (N.D. Cal. 2022) .................................................................................17

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019)...............................................................................................17

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)..........................................................................................8, 10

*Mobile Acuity Ltd. v. Blippar Ltd.*,
    No. 22-cv-2216, 2024 WL 3659127 (Fed. Cir. Aug. 6, 2024) ...............................................17

*Nielsen Co. (US), LLC v. TVision Insights, Inc.*,
    C.A. No. 21-1592, 2022 WL 3226318 (D. Del. Aug. 10, 2022) ...............................13, 14, 16

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016)...............................................................................................16

*Rosenau v. Unifund Corp.*,
    539 F.3d 218 (3d Cir. 2008).......................................................................................................7

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014).....................................................................................................17

*Thales Visionix Inc. v. United States*,
    850 F.3d 1343 (Fed. Cir. 2017)...................................................................................... *passim*

*Turbe v. Gov't of Virgin Islands*,
    938 F.2d 427 (3d Cir. 1991).......................................................................................................7

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017)......................................................................................10

*XY, LLC v. Trans Ova Genetics, LC*,
  968 F.3d 1323 (Fed. Cir. 2020)...............................................................................12, 13

**Statutes**

35 U.S.C. § 101 ................................................................................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 12(c) .............................................................................7

## I.     NATURE AND STAGE OF THE PROCEEDINGS

RVT filed suit against ABB in September 2022, alleging that ABB's FlexVision product infringes the '814 patent, along with two other patents. D.I. 1. As of the filing of this brief, the parties are completing fact discovery. Trial is currently scheduled for April 2025.

## II.    SUMMARY OF ARGUMENT

1.      The '814 patent claims are not directed to an abstract idea. They are drawn to a novel, specific, and concrete series of steps that enables machine-vision systems using one or more image sensors to accurately determine the position and location of fixed features on three-dimensional objects without the need for stereo camera pairs or structured light. Such claims— i.e., those that cover specific processes that improve upon the prior art—are eligible for patenting under well-settled Supreme Court and Federal Circuit precedent. *See, e.g.*, *Diamond v. Diehr*, 450 U.S. 175 (1981); *Thales Visionix Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017).

2.      ABB attempts to circumvent that caselaw by grossly mischaracterizing the claims. ABB asserts, for example, that claim 1 is directed to "gathering information to setup and solve a system of equations," ABB Br. at 10, 13—a formulation that ignores every operative step of the claim. As the Federal Circuit has cautioned, "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). ABB's reductive approach to eligibility would "make all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious." *Diehr*, 450 U.S. at 189 n.12. The invention actually claimed in the '814 patent—as opposed to ABB's caricature of it—is the type of "[i]ndustrial process[] . . . which ha[s] historically been eligible to receive the protection of our patent laws." *Id.* at 184. ABB's motion for judgment on the pleadings (D.I. 195) should be denied.

III.    STATEMENT OF FACTS

A.    Prior-art machine-vision techniques and their drawbacks

The '814 patent relates to machine-vision methods and systems that enable robots to locate and manipulate three-dimensional objects. Robots with this capability are useful in numerous modern industrial applications, such as automotive assembly lines. '814 patent 1:1–26.

Prior-art approaches to machine vision generally fell into one of two categories: those that used stereo camera pairs (also referred to as stereovision) and those that used structured light. Stereovision involves positioning two or more cameras on the same target object, obtaining images of the object from the different corresponding vantage points, and using "[t]he difference amongst the apparent position of corresponding features in each of the images i.e., the parallax . . . to calculate the three dimensional coordinates of such features." '814 patent 1:39–43. These systems suffer from several problems, however, which make them "impractical for industrial applications." *Id.* 1:46–47. For one thing, they "require exactly known geometrical relationships between camera pairs" in order to produce accurate results. *Id.* 1:49–50. Stereo methods also "require the use of at least double the number of cameras which drives up the cost, complexity and the need for calibration" of the various cameras. *Id.* 1:50–53.

The structured-light approach typically employs lasers to project patterns onto the target object, uses multiple cameras to take images of the resulting patterned object, and then relates the various images to one another to determine the position and location of the object. *Id.* 1:54–62. This approach likewise has drawbacks. It involves "expensive specialized sensors as opposed to . . . standard off-the-shelf hardware" and requires "knowledge of exact geometric relationships between all elements of the system," including the "cameras and lasers." *Id.* 1:64–2:1. Structured-light systems are also susceptible "to damage or misalignment when operating in industrial environments" and can pose "safety hazard[s] when laser light sources are deployed in

the proximity of human operators." *Id.* 2:1–4.

### B.    The patented invention

RVT's '814 patent eliminates these drawbacks and enables machine vision that is simpler to deploy, more accurate, and cheaper. *Id.* 2:5–10. The invention "eliminate[es] the need for stereo cameras and lasers," as well as "the need for inter-camera calibration and the need for priori knowledge of geometrical relationships between all object features." *Id.* 2:29–34. In other words, the patent enables machine vision systems to use one or more cameras to locate object features in three dimensions *without* using lasers and without knowing anything about where the cameras are located relative to each other or the nature of the object in question.

Before describing the specifics of the claimed invention, a bit of background is in order. Generally speaking, machine vision can involve three steps: camera calibration, training, and pose estimation. *Camera calibration* refers to the process of determining the camera's intrinsic properties, such as focal length ("intrinsic calibration") and its position and orientation in an external reference frame ("extrinsic calibration"). *Id.* 9:10–48. Extrinsic calibration may not be required if the system is seeking only to model the object in question rather than to estimate its pose with respect to an external coordinate system. *Id.* 9:49–54.[1] *Training* "refers to the process whereby an object and its attributes are introduced to the machine vision system." *Id.* 9:57–59. "During the training process, images of the training object are captured . . . and various landmark features are selected whose geometrical properties are determined and stored." *Id.* 9:59–63. In other words, the training step allows the system to learn about the object and its features. *Pose*

---

[1] Calibration of individual cameras (the sort of calibration discussed in column 9 of the patent) should not be confused with "inter-camera calibration," which refers to the need in prior-art systems for "exactly known geometrical relationships *between camera pairs*." '814 patent 1:49–50, 2:32 (emphasis added).

*estimation* refers to determining the object's position and orientation with respect to an external coordinate system—in layman's terms, figuring out where the object is. *Id.* 8:67–9:3. Pose estimation is one useful (and common) application of machine-vision systems—but it is not the only one. *Id.* 9:5–8. As explained further below, such systems may also "be employed for . . . inspection or modeling." *Id.*

The '814 patent is focused on the training step. As depicted in Figure 1 (below), image sensors 24a, 24b, and 24c each have a field of view (represented by dashed lines 26a, 26b, and 26c, respectively) of a target object 12. *Id.* 7:41–44.



The image sensors take pictures of various features of the target object (represented by geometric shapes 42a–42i). *Id.* 8:1–6. These "features" can be "visually distinctive features inherent in the object 12, for example slots, holes, or other apertures, lines, and/or edges." *Id.* 8:11–13.

Each image sensor can acquire multiple images of the same features, each taken from a different vantage point. *Id.* 8:55–58. This is illustrated in Figures 3A and 3B. *See id.* 8:40–58. The information from these images can be used to generate a "local model," which is a model local to the image sensor that describes a group of features. *See id.* 10:38–11:2.

- 4 -

Figure 6 provides an overview of how the local-model generation works. The system acquires a view of the object and stores information about its features (step 120). *Id.* 10:14–22. It also determines if other views need to be acquired to obtain comprehensive information about the features' position and location relative to one another (step 121). *Id.* 11:20–30. This determination is based on several factors, including the number of image sensors, the number of features identified, the number of features with an invariant (i.e. fixed) physical relationship, and the type of invariant physical relationship. *Id.* 2:48–56, 11:22–63.

Next, the system changes the pose of the object relative to the image sensor(s) to generate the required additional views (step 122). *Id.* 11:64–67. The system then "extract[s]" the features (step 124). *Id.* 12:13–15. This step, described in Figure 7, involves storing the (x, y) coordinates associated with each feature-view-camera combination. *Id.* 12:28–56.[2]

Finally, the system uses the information stored in step 124 to "compute[] the three-dimensional positions of the features in the respective coordinate frames associated with each image sensor" (step 128). *Id.* 12:24–27. It does this by constructing a system of non-linear equations, which is possible because the system knows that the features are fixed relative to one another. *Id.* 12:57–13:25. For example, the relationship between features *i* and *j* in view *s* is known to be the same as the relationship between features *i* and *j* in view *t*. *See id.* Fig. 8B (step 164). The system is then solved using a minimization algorithm to determine the position information for the features. *See id.* Fig. 8B (step 168).[3] These are the local models.

---

[2] The system can optionally incorporate "sparse model information"—i.e., information describing "the geometric physical attributes between object features or the geometrical attributes of a single feature"—if such information is available. '814 patent 12:16–23.

[3] ABB's assertion (at 3) that "the 'number of unknowns is not greater than the number of equations' simply means that the system of equations can be solved" is not quite right. The quoted statement is true for *linear* equations, but not for *nonlinear* equations like those described in the '814 patent. Solving systems of nonlinear equations does not involve merely obtaining at

These local models are useful in several respects. *First*, the system may use the local models to estimate the pose of the entire three-dimensional object in question. *Id.* 15:8–12. *Second*, the system may use the local models to inspect the object. *Id.* 16:15–17. *Third*, the local models may be used to "create a comprehensive object model" (for example, a CAD model) of the target object. *Id.* 9:51–52, 16:17–21.

### C. The claims

This process of determining the position and location of feature groups is set forth in the claims. For example, claim 1 recites a method useful in machine vision that comprises:

> acquiring a number of images of a first view of a training object from a number of image sensors;
>
> identifying a number of features of the training object in the acquired at least one image of the first view;
>
> determining a number of additional views to be obtained based at least in part on the number of image sensors, the number of features identified, the number of features having an invariant physical relationship associated thereto, and a type of invariant physical relationship associated with the features, sufficient to provide a system of equations and unknowns where the number of unknowns is not greater than the number of equations;
>
> acquiring at least one image of each of the number of additional views of the training object by the at least one camera; and
>
> identifying at least some of the number of features of the training object in the acquired at least one image of the number of additional views of the training object[;]
>
> employing at least one of a consistency of physical relationships between some of the identified features to set up the systems of equations; and
>
> automatically computationally solving the system of equations.

---

least as many equations as unknowns (and some such systems have no solution at all). Instead, a solution must be approximated by employing a minimization algorithm like those described in the specification. *See* '814 patent 19:15–17.

*Id.* 21:59–22:15.

## IV.   LEGAL STANDARD

**Motion for judgment on the pleadings.** "When evaluating a motion for judgment on the pleadings, courts must 'view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Cirba Inc. v. VMware, Inc.*, C.A. No. 19-742, 2023 WL 2989049, at *1 (D. Del. Apr. 18, 2023) (Williams, J.) (quoting *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008)). "Ultimately, a motion for judgment on the pleadings can be granted 'only if no relief could be afforded under any set of facts that could be proved.'" *Id.* (quoting *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991)).[4]

**Patent eligibility.** Section 101 provides that any "new and useful process, machine, manufacture, or composition or matter, or any new and useful improvement thereof," may be patented. There are three judicially crafted exceptions to section 101's reach: laws of nature, natural phenomena, and abstract ideas are not eligible for patenting. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

Courts must "tread carefully" in construing the scope of these exceptions "lest [they] swallow all of patent law." *Id.* at 217. Specifically, courts "must distinguish between patents that claim the 'building blocks' of human ingenuity and those that integrate the building blocks into something more thereby 'transforming' them into a patent-eligible invention." *Cirba*, 2023 WL 2989049, at *1 (quoting *Alice*, 573 U.S. at 217). "The latter"—that is, concrete *applications* of natural laws, natural phenomena, or abstract ideas—pose little "risk of preemption, and therefore remain eligible" for patenting. *Id.* (quoting *Alice*, 573 U.S. at 217). "Whether a claim recites

---

[4] The Rule 12(c) standard is provided by regional circuit law. *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018).

patent eligible subject matter is a question of law which may contain disputes over underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

Courts use a two-step test to analyze patent eligibility. *See Alice*, 573 U.S. at 217. Step one asks whether the claim at issue is "directed to" an ineligible concept. *Id.* This analysis looks at the claim "as a whole." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1367 (Fed. Cir. 2020). In conducting step one, courts should "consider the patent's written description," which "informs [the] understanding of the claims." *Id.* at 1368. "[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). If the claim is not directed to an ineligible concept, it satisfies § 101 and the analysis ends. *Cirba*, 2023 WL 2989049, at *2.

If the claim *is* directed to an ineligible concept, the court proceeds to *Alice*'s second step. *CardioNet*, 955 F.3d at 1368. Step two asks whether the claim elements, individually or in combination, impart an "inventive concept," *Cirba*, 2023 WL 2989049, at *2—for example, something that "improve[s] an existing technological process," *Alice*, 573 U.S. at 223. Simply implementing an abstract idea with "well-understood, routine, and conventional" steps is not sufficient to impart an inventive concept. *Id.* at 225 (cleaned up). This principle ensures the claim is not a "drafting effort designed to monopolize the abstract idea." *Cirba*, 2023 WL 2989049, at *2. But "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). That is because "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

Whether something is well-understood, routine, or conventional is a question of fact.

*Berkheimer*, 881 F.3d at 1368. Like any fact "pertinent to the invalidity conclusion," it "must be proven by clear and convincing evidence." *Id.*; *accord Cirba*, 2023 WL 2989049, at *2.

## V.     ARGUMENT

### A.     The '814 patent claims are not directed to an abstract idea.

There is nothing abstract about the '814 patent. The asserted claims are directed to a specific series of steps that comprise an "[i]ndustrial process[]" useful in robotic vision—the type of process that "ha[s] historically been eligible to receive the protection of our patent laws." *Diehr*, 450 U.S. at 184. And ABB's contrary arguments simply mischaracterize the claims.

> **1.     The claims are directed to a novel, specific, and concrete series of steps that enable machine-vision systems using one or more image sensors to accurately determine the position and location of fixed features on three-dimensional objects without the need for stereo camera pairs or structured light.**

**a.**     The '814 patent claims are the antithesis of abstraction. They recite a specific method of locating features on three-dimensional objects with one or more cameras for use with a manufacturing robot that avoids the drawbacks of prior-art stereovision and structured-light approaches. The method consists of a series of steps for use in machine-vision applications that enables accurately locating features without requiring the use of multiple cameras, without requiring a priori knowledge of the cameras' location relative to each other or the features of the object in question, and without using potentially dangerous lasers. The steps proceed as follows:

- Use an image sensor to make a picture of the object and store information about its features. '814 patent 10:14–22.[5]

- Analyze several factors to determine whether other views are needed to obtain comprehensive information about the features' position and location relative to one

---

[5] The "directed to" inquiry often involves "looking to the specification to understand the problem facing the inventor and, ultimately, what the patent describes as the invention." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019).

another. *Id.* 11:20–63.

- Acquire any necessary additional views. *Id.* 11:64–67.

- Store the resulting information about the features. *See id.* 12:13–56.

- Use that information to "compute[] the three-dimensional positions of the features in the respective coordinate frames associated with each image sensor." *Id.* 12:24–27, Fig 8B.

"There is nothing abstract about this." *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 485 F. Supp. 3d 505, 517–18 (D.N.J. 2020) (method of generating image of a roof by "us[ing] specific images" and "correlate[ing] these specific images . . . in a specific way" was not directed to an abstract idea). The '814 patent claims a specific process with specific steps that makes machine-vision systems work better and solves specific problems in the field. "Industrial processes such as this are the types which have historically been eligible to receive the protection of our patent laws." *Diehr*, 450 U.S. at 184.

As the very authority cited in ABB's brief demonstrates, patent claims that "focus on a specific means or method" are patentable; the abstract-idea exception applies to those that "abstractly cover results" without specifying a concrete means of achieving them. ABB Br. 8 (quoting *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017)); *McRo Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). As the description above illustrates, the '814 patent claims fall squarely in the former category.

ABB in fact acknowledges (at 4–5, 12) that the patent solves problems associated with the prior-art stereovision and structured light approaches. But ABB takes the incredible position that these problems are not "technical" because the advances of the claimed invention relate to "cost, safety, and convenience." That is nonsense. The move from candles to lightbulbs also solved "problems of cost, safety, and convenience," since people no longer required open flames to light their homes. But no one would argue that Edison's invention was not "technical."

ABB's further assertion (at 5, 12) that the "claims are broad enough to cover systems/methods that have the same 'drawbacks' identified in the specification" is incorrect. While individual cameras may still need to be calibrated, the patented method eliminates the need for *inter-camera* calibration—that is, calibrating the relative position of multiple cameras. '814 patent 1:49–50, 2:32; *see supra* n.1. And the method does not *require* a priori knowledge of relationships between object features. Instead, that information (sometimes referred to in the patent as "sparse model information") is expressly identified as optional. *Id*. 12:16–23. That the method *can* use such sparse model information does not change the fact that it improved on the prior art by not *requiring* such information. *Contra* ABB Br. 12.

**b.** The '814 patent claims are closely analogous to those that have been found eligible in prior cases. The Federal Circuit's decision in *Thales* is particularly instructive. The patent there claimed a method of "determining an orientation of an object relative to a moving reference frame based on signals from two initial sensors mounted respectively on the object and on the moving reference frame." 850 F.3d at 1345–46. The court observed that, "[w]hile the claims utilize[d] mathematical equations to determine the orientation of the object relative to the moving reference frame," they were not directed to those equations. *Id*. at 1348. Instead, they were directed to a method "that use[d] inertial sensors in a non-conventional manner to reduce errors in measuring the relative position and orientation of a moving object on a moving reference frame." *Id*. at 1348–49. In this way, the *Thales* method was "nearly indistinguishable from" the method at issue in *Diehr*, which involved a specific series of steps for curing rubber products and thus was eligible for patenting notwithstanding its use of "the well-known Arrhenius equation to calculate the optimal cure time." *Id*. at 1347–48.

A similar conclusion is appropriate here. Like the claims in *Thales* and *Diehr*, the '814

patent claims *involve* mathematical equations, but they are not *directed to* those equations. Instead, the claims are directed to a novel and specific series of steps that allows for determination of the 3-D position of object features in a way that is cheaper, easier, and more accurate than the prior art. Indeed, the '814 patent claims are far more detailed and concrete than the method claim in *Thales*. *Compare* '814 patent claim 1, *with Thales*, 850 F.3d at 1345–46 (quoting method claim 22). If the *Thales* claim was eligible, the '814 patent claims certainly are.

*XY, LLC v. Trans Ova Genetics, LC*, 968 F.3d 1323 (Fed. Cir. 2020), also illustrates why the '814 patent claims are eligible. The patent in *XY* claimed a method of "sorting particles using flow cytometry technology" that involved mathematically transforming data from cytometers to "enhance separation between data points." *Id*. at 1326–28. The transformations enabled for more accurate discrimination between populations of particles (for example, X versus Y sperm). *Id.* The district court had found the claims ineligible, holding that they were directed to the mathematical equations that effected the data transformation. *Id.* at 1330.

The Federal Circuit reversed. *Id.* at 1331. "Like the claims in *Diehr*," the court explained, "the asserted claims describe[d] in detail a step-by-step method for accomplishing a physical process." *Id.* (cleaned up). That is, the claims covered "a purported improvement to otherwise-known industrial or laboratory processes through specific application of mathematical algorithms." *Id.* And, like the claims in *Thales*, the *XY* claims employed a specific method that could "generate more accurate information about [an] object than was previously possible in the art." *Id.* "As in *Diehr* and *Thales*," the court concluded, the claims in *XY* "implement[ed] or appl[ied] mathematical formulas in a structure or process which, when considered as a whole, [was] performing a function which the patent laws were designed to protect." *Id.* at 1332.

So too here. The '814 patent claims recite a specific series of steps that enables easier,

cheaper, and more accurate determination of "information about [an] object," *Id.* at 1331. The

method is useful in numerous concrete industrial applications, such as automobile construction.

That is precisely the sort of thing that "the patent laws were designed to protect." *Id.* at 1332.

Federal Circuit Judge Bryson's opinion in *CyWee Group Ltd. v. Samsung Electronics

Co.*, No. 2:17-CV-140, 2018 WL 5831241 (E.D. Tex. Nov. 7, 2018), is likewise on point. The

claims in that case "involve[d] using a particular combination of sensors to gather raw data

points relating to an object's position, and then placing those data points into a mathematical

formula to determine the orientation of the object in a spatial reference frame. *Id.* at *4. Judge

Bryson rejected the defendants' argument that these claims were ineligible because they "merely

recite[d] algorithms that operate on data obtained from conventional sensors." *Id.* at *3. Relying

on *Thales* and *Diehr*, he reasoned that "improvements" in "orientation-sensing devices and

methods" "are patentable even when the improvements in the devices are the product of

improvements in the sophistication of the algorithms that drive the product's performance." *Id.* at

*4–5. The claims in that case were eligible because they did "not simply describe a mathematical

algorithm"; instead, they were directed to a specific method for using inputs from conventional

sensors to enable more accurate determination of an object's orientation. *Id.* at *6. The claims

here are eligible for the same reason, as explained above: they recite a "sophisticat[ed] . . .

algorithm" that enables more accurate location of object features in 3-D space.[6]

―――――――――――――

    [6] *See also Beacon Navigation GmbH v. Bayerische Motoren Werke AG*, No. 2:13-cv-
11410, 2023 WL 8951535, at *9 (E.D. Mich. Sept. 28, 2023) (relying on *Thales* and *Diehr* to
conclude that claims to a navigation system that "use[d] information from a GPS, motion
sensors, and a map database" in a novel way to "more accurately determine the current position"
were not directed to an abstract idea); *Nielsen Co. (US), LLC v. TVision Insights, Inc.*, C.A. No.
21-1592, 2022 WL 3226318, at *4 (D. Del. Aug. 10, 2022) (claims reciting a "method that
utilizes a three-dimensional sensor to obtain data on a first object, but only if the object is within
a threshold distance from the sensor, and using a two-dimensional sensor to obtain data on a
second object, but only if the object is outside of that threshold distance from the sensor" were

## 2. ABB's step one arguments grossly overgeneralize the claims.

ABB's step one arguments suffer from several flaws, but chief among them is ABB's failure to accurately characterize the claims. ABB variously describes claim 1 as directed to

- "gathering enough information from enough images to set up and solve a system of equations," ABB Br. 1;

- "analyzing features in images to determine the number of additional images that need to be obtained sufficient to set up and solve a series of equations," *id.* at 8; *see also id.* at 2;

- "gathering information to setup and solve a system of equations," *id.* at 10, 13; and

- "capturing images, identifying features, and performing mathematical operations," *id.* at 11.

As an initial matter, ABB's inability to consistently characterize the claims' focus "suggest[s] weakness" in its position. *Nielsen*, 2022 WL 3226318, at *1–2 ("[A] defendant who argues a Section 101 motion will get into trouble by being less than clear about what the purported abstract idea actually is."). Even setting that issue aside, all ABB's formulations are gross over-generalizations. The claims recite a specific series of steps that identifies object features in an improved way and thereby makes machine-vision systems better. They do not simply recite "gathering information to set up and solve a system of equations," ABB Br. 10. *Cf. EagleView*,

---

not directed to an abstract idea but rather to "an application of an idea that is meant to solve a technological problem"); *EagleView*, 485 F. Supp. 3d at 512, 516–18 (claims reciting methods and systems for using "correlations of non-stereoscopic images to generate three-dimensional roof models" were not directed to an abstract idea but rather to a "technological solution to the well-known problem of generating a roof report without a human's manual, direct measurement of a roof"); *Align Tech., Inc. v. 3Shape A/S*, 339 F. Supp. 3d 435, 449–51 (D. Del. 2018) (claims reciting method for generating a model of a patient's mouth that solved certain "problem[s] with prior approaches" were not directed to an abstract idea but rather "to an improved method for generating a model of an intraoral site"); *Blackbird Tech. LLC v. Niantic, Inc.*, C.A. No. 17-1810, 2018 WL 5630452, at *3–4 (D. Del. Oct. 31, 2018) (claims reciting a "specific" method for taking camera images of a user's location and mapping the images into a virtual video game environment were not directed to an abstract idea but rather an improved method of "creating a more interactive video game environment").

485 F. Supp. 3d at 518 (rejecting § 101 arguments that "improperly oversimplif[ied] the [p]atents and focus[ed] on a few 'well-known math equations' and 'data manipulation methods'").

Once ABB's mischaracterization of the claims is corrected, its step one arguments collapse. Only by ignoring the first six steps required by the claims, for example, can ABB argue (at 6 n.4) that the '814 patent "purports to preempt all [prior-art] algorithms" historically used for solving systems of non-linear equations. Only by ignoring the concrete and detailed series of steps required by the claims can ABB argue (at 10) that "the patent's 'focus' is on the 'result' allegedly achieved by this abstract idea . . . and not on any 'specific means' that achieves that result." *Cf. Cirba*, 2023 WL 2989049, at *2 (finding claim eligible at step one because it did "more than merely collect, analyze, and display available information"; it set forth specific steps that solved "practical challenges in managing distributed systems"). And only through its gross overgeneralizations can ABB assert (at 1) that the claims "preempt methods for image analysis that humans were performing by hand since before computers existed." To be clear, there is zero evidence that that anyone ever performed the claimed method "by hand," and ABB cites none. On the contrary, the specific claimed series of steps was novel; that is why the Patent Office granted the patent. *See* Ex. 1 (Notice of Allowance). *Cf. CardioNet*, 955 F.3d at 1368, 1370 (claims that focused on a "specific method" of analyzing cardiac data that had not previously been performed by doctors were directed to a technological improvement, not an abstract idea).

ABB's related contentions (at 6–7, 12–13) that a human can perform the claimed method are incorrect.[7] The user can *set up* the process by selecting features of interest and can provide input at various steps along the way, but the machine-vision system is required to take images of

---

[7] Even ABB cannot bring itself to say that *all* the claimed steps can be performed manually. *See* ABB Br. 12.

the object, determine if additional views are needed, and use those views to determine the features' position. Just as the *CardioNet* court found it "difficult to fathom how doctors mentally or manually 'used logic to identify the relevance of the variability in the beat-to-beat timing using a non-linear function of a beat-to-beat interval' as required by" the claim at issue there, it is flatly implausible for ABB to suggest that a human could use a pencil and paper to obtain all the information required by claim 1 and use it to set up and solve a system of non-linear equations. 955 F.3d at 1371. "The entire reason a claim like [this] exists is because technology is being asked to fill a void that humans reasonably cannot." *Nielsen*, 2022 WL 3226318, at *5.

Moreover, even if humans somehow *could* carry out these steps, it would be beside the point. Human-conducted processes have long been held patent-eligible if the process itself is new and useful. *See, e.g.*, *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1047–48 (Fed. Cir. 2016) (claims to a method for producing cryopreserved hepatocytes that involved manually subjecting the hepatocytes to multiple freeze-thaw cycles was directed to a patent-eligible "new and useful laboratory technique"). "The mere fact that humans have [] alternative method[s] of achieving the goals of the claims using sensory perception [and] mental processing . . . does not foreclose the claims' patent eligibility." *Carrum Techs., LLC v. BMW of N.A., LLC*, C.A. No. 18-1645, 2019 WL 1779863, at *3 (D. Del. Apr. 23, 2019). Indeed, a contrary holding would mean every patent directed to artificial intelligence was void.

ABB also asserts (at 11) that "[t]he claims do not even require using the result of the claimed method to, for example, cause a robot to perform a specific function." *See also* ABB Br. 3, 11 ("The result is not used for *anything*."). As an initial matter, that is not even true; some of the claims require using the result to estimate the pose of a three-dimensional object. *See, e.g.*, '814 patent claims 6, 12, 18, 22, 38. In any event, patent claims do not have to recite the end-use

of a novel process to be eligible. A claim "directed to improving the functionality of one tool . . . that is part of an existing system . . . does not necessarily need to recite how that tool is applied in the overall system . . . to constitute a technological improvement that is patent-eligible." *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019); *Google LLC v. EcoFactor, Inc.*, 602 F. Supp. 3d 1265, 1272, 1275 (N.D. Cal. 2022) (rejecting argument that claims were ineligible because they did "not specify *how* the claimed improvement is implemented"). The '814 patent claims recite a new and useful method of training a machine-vision system—a method that can be useful in multiple applications, including pose estimation, inspection, and modeling. '814 patent 9:5–8. ABB's suggestion that the claims must identify the specific application in order to be eligible is contrary to law. *Koninklijke*, 942 F.3d at 1151.

Relatedly, ABB's assertions (at 4, 6, 14–15) that the '814 patent does not claim a new method of camera calibration or pose estimation are irrelevant. The claims are focused on training, not camera calibration or pose estimation. A patent plainly does not have to improve every aspect of an "overall system" to be rendered eligible; it is enough to claim an improvement to part of the system. *Koninklijke*, 942 F.3d at 1151.

Finally, ABB observes (at 7, 12) that the text of RVT's complaint does not contain allegations about the specific inventive features claimed in the '814 patent. True—but it does not need to. Patent eligibility is an affirmative defense, *see Mobile Acuity Ltd. v. Blippar Ltd.*, No. 22-cv-2216, 2024 WL 3659127, at *5 (Fed. Cir. Aug. 6, 2024), and "a complaint need not anticipate or overcome affirmative defenses," *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014). In any event, as described above, the patent itself—which is attached to the complaint and thus part of the pleadings—explains the nature of the advance and its advantages over the prior art and so shows that the claims pass muster under § 101. *See CardioNet*, 955 F.3d at 1368–69

- 17 -

(analyzing specification's description of the invention's advantages to conclude that the claims were not directed to an abstract idea).

*     *     *

In short, the '814 patent claims a specific method that enables accurate determination of object features in 3-D space—not an abstract idea. The Court thus need not reach *Alice* step two.

**B.     The '814 patent claims contain inventive concepts.**

In any event, the claims do contain inventive concepts. As explained in detail above, the ordered combination of claimed steps allows for accurate determination of the position and orientation of object features without the need for stereo camera pairs or structured light. That is something the prior art could not do.

ABB's step two arguments are underdeveloped and largely boil down to a contention that the hardware components recited in the claims are conventional. The hardware used in the claimed method *is* "standard" and "off-the-shelf," ABB Br. 14, to be sure, but ABB misses the point. This is not a hardware invention. The invention here is a new method of using hardware to obtain a better, faster, and cheaper determination of the position of object features.

Indeed, the Supreme Court rejected an argument closely analogous to ABB's here in *Diehr*. In that case, the patent claimed a process for curing rubber that constantly measured the temperature inside the rubber mold and then used that temperature to calculate the remaining curing time via a well-known mathematical equation called the Arrhenius equation. 450 U.S. at 178–79. The Supreme Court rejected the proposition that the process was ineligible for patenting because the individual steps of curing rubber were "well known" and the Arrhenius equation itself was not "patentable in isolation." *Id.* at 188–89. In determining eligibility, the Supreme Court explained, "[i]t is inappropriate to dissect the claims into old and new elements and then [] ignore the presence of the old elements in the analysis." *Id.* at 188.

The same rationale applies here. The "industrial process[]" recited in the '814 patent may involve conventional components and mathematical equations, but the specific series of claimed steps is new, useful, and "the type[] which ha[s] historically been eligible to receive the protection of our patent laws." *Id.* at 184; *see also CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1098–99 (Fed. Cir. 2021) (claims to method of user authentication whose steps "were developed by the inventors, are not admitted prior art, and yield certain advantages over the described prior art" contained an inventive concept). It is thus eligible for patenting.

To the extent ABB means to imply (at 14–15) that the ordered combination of the claimed steps is somehow conventional, that assertion is unsupported and wrong. ABB cites nothing in the pleadings—or anywhere else—to support this statement, nor does any support exist. The Patent Office allowed the claims precisely because the claimed process is not found in the prior art. *See* Ex. 1 (Notice of Allowance). ABB cannot deem this a "conventional ordering of steps" merely by asserting it is so (or even by asserting that it is "clearly so"). *See Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980, 986 (Fed. Cir. 2018) ("[J]ust saying that something is so does not make it true . . . .").

At the very least, there are factual disputes that preclude judgment on the pleadings. The specification makes clear (and the Patent Office agreed) that the combination of steps recited in the '814 patent was novel and useful. ABB thus cannot show as a matter of law that the claimed steps are well-understood, routine, and conventional. *Cf. Align Tech., Inc. v. 3Shape A/S*, C.A. No. 17-1647, 2020 WL 5979353, at *2 (D. Del. Oct. 8, 2020) (Stark, J.) (denying motion for judgment on the pleadings that claims to a method for developing a dental treatment plan was ineligible because it was "at least plausible that there is something in the patented invention that

might be unconventional, not well-known, or not well-understood").[8]

*     *     *

One final point is in order. "At both steps one and two, it is often useful for the Court to compare the claims at issue with claims that have been considered in the now considerably large body of decisions applying § 101." *Align Tech.*, 339 F. Supp. 3d at 443 (citing *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016)). It is telling, then, that ABB fails to cite a *single case* holding that claims analogous to those here—that is, claims that recite a specific series of steps that improve a robot's ability to locate objects—were ineligible.[9] Instead, ABB relies on cases holding that claims to analysis, organization, and transmission of data, without more, are ineligible. *See* ABB Br. 10–11, 12–13, 15.

The claims here bear no resemblance to the claims at issue in those cases. Instead, these claims are similar to those at issue, for example, in *Diehr*, *Thales*, and *XY*. *See supra* Section V.A.1. The Court here should therefore reach the same conclusion as the courts in those cases: the '814 claims are eligible.

## VI. CONCLUSION

The Court should deny ABB's motion for judgment on the pleadings.

---

[8] To the extent ABB maintains its ineligibility arguments through expert discovery, RVT will—in accordance with the dates set forth in the Court's Scheduling Order (D.I. 48)—offer expert opinion further supporting the proposition that the patent contains inventive concepts.

[9] The closest ABB comes to an on-point factual analogy is a drive-by citation to an International Trade Commission Administrative Law Judge's cursory (and pre-*Alice*) § 101 analysis of two machine vision patents. *See* ABB Br. 10 (citing *Certain Mach. Vision Software, Machine Vision Sys., and Prods. Containing Same Initial Determination*, No. 337-TA-680, 2010 WL 4778782, at *49–50 (U.S.I.T.C. July 16, 2010)). Even setting aside that decision's lack of precedential force, the analogy is unpersuasive. The claims at issue in that investigation were less specific, and more result-oriented and functional, than the claims at issue here. *See id.* at *12, 26–27. Indeed, as explained above, the claims here are far *more* specific and concrete than the method claim held eligible in *Thales*. *Thales* thus controls.

Respectfully submitted,

/s/ Andrew E. Russell
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Emily DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com

*Attorneys for RoboticVISIONTech, Inc.*

OF COUNSEL:
J.C. Rozendaal
Michael E. Joffre
Daniel S. Block
William H. Milliken
Kristina Caggiano Kelly
Anna G. Phillips
Steven M. Pappas
Brooke N. McLain
Paige E. Cloud
Ryan N. Kaiser
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1101 K Street NW, 10th Floor
Washington, DC 20005
(202) 371-2600

Dated: August 12, 2024